Ryan E. Hatch (SBN 235577)
ryan@hatchlaw.com
HATCH LAW, PC
13323 Washington Blvd., Suite 100
Los Angeles, CA 90066
Tel: 310-279-5079
Fax: 310-693-5328

(*additional counsel listed on next page*)

*Attorneys for Plaintiff*
*MICROPAIRING TECHNOLOGIES LLC*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MICROPAIRING TECHNOLOGIES LLC,<br><br>                              Plaintiff,<br>       v.<br>HYUNDAI MOTOR AMERICA,<br>                              Defendant. | Case No. 8:21-cv-00881<br><br>**PLAINTIFF MICROPAIRING TECHNOLOGIES LLC'S COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT

Edward R. Nelson III (Texas SBN 00797142)
ed@nbafirm.com
*pro hac vice forthcoming*
Ryan P. Griffin (Texas SBN 24053687)
ryan@nbafirm.com
*pro hac vice forthcoming*
Brian P. Herrmann (Texas SBN 24083174)
brian@nbafirm.com
*pro hac vice forthcoming*
NELSON BUMGARDNER ALBRITTON PC
3131 West Seventh Street
Suite 300
Fort Worth, TX 76107
Telephone: 817.377.9111

Timothy E. Grochocinski (Illinois SBN 6295055)
tim@nbafirm.com
*pro hac vice forthcoming*
NELSON BUMGARDNER ALBRITTON PC
15020 S. Ravinia Avenue, Suite 29
Orland Park, Illinois 60462
Telephone: 708.675.1974

*Attorneys for Plaintiff*
*MICROPAIRING TECHNOLOGIES LLC*

Plaintiff MicroPairing Technologies LLC ("MicroPairing") brings this action against Defendant Hyundai Motor America ("Hyundai") for infringement of U.S. Patent Nos. 6,778,073 ("the '073 patent"), 7,793,136 ("the '136 patent"), 8,953,816 ("the '816 patent"), 9,697,015 ("the '015 patent"), 8,583,292 ("the '292 patent"), and 7,178,049 (the '049 patent"), alleging as follows:

## THE PARTIES

1.    Plaintiff MicroPairing Technologies LLC is a Texas limited liability company located in Plano, Texas.

2.    Defendant Hyundai Motor America is a California Corporation with its principal place of business located at 10550 Talbert Avenue, Fountain Valley, California 92708.

## JURISDICTION AND VENUE

3.    This action arises under the patent laws of the United States, 35 U.S.C. § 101, *et seq.*  This Court's jurisdiction over this action is proper under the above statutes, including 35 U.S.C. § 271, *et seq.*, 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1338 (jurisdiction over patent actions).

4.    This Court has personal jurisdiction over Hyundai in accordance with due process and/or the California Long Arm Statute because, among other things, Hyundai is a California corporation with its principal place of business in this District.

5.    Further, this Court has personal jurisdiction over Hyundai because it has engaged, and continues to engage, in continuous, systematic, and substantial activities within this state, including the substantial marketing and sale of products and services within this state and this District.  Indeed, this Court has personal jurisdiction over Hyundai because it has committed acts giving rise to MicroPairing's claims for patent infringement within and directed to this District, has derived substantial revenue from its goods and services provided to individuals in this state and this District, and maintains a regular and established place of business in this District, including its principal place of business in Fountain Valley.

COMPLAINT

6.    Relative to patent infringement, Hyundai has committed and continues to commit acts in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, and/or sold infringing products and services in this state, including in this District, and otherwise engaged in infringing conduct within and directed at, or from, this District.  Such infringing products and services, namely Hyundai and Genesis vehicles with infotainment systems and/or that operate on the AUTOSAR platform, have been and continue to be distributed to, offered for sale, sold, and used in this District, and the infringing conduct has caused, and continues to cause, injury to MicroPairing, including injury suffered within this District.  These are purposeful acts and transactions in this state and this District such that Hyundai reasonably should know and expect that it can be haled into this Court because of such activities.

7.    Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because Hyundai resides in this district under § 1400(b) due to it being a California Corporation with its principal place of business in this District. Additionally, as a separate and independent basis for venue under § 1400(b), Hyundai has a regular and established place of business in this District (at its principal place of business in Fountain Valley) and has committed extensive of acts of infringement in this District through sales of Hyundai and Genesis vehicles with infotainment systems.

### THE PATENTS-IN-SUIT

8.    The '073 patent is entitled, "Method and Apparatus for Managing Audio Devices."  The '073 patent lawfully issued on August 17, 2004 and stems from U.S. Patent Application No. 09/892,295, which was filed on June 26, 2001.  A copy of the '073 patent is attached hereto as Ex. 1.

9.    The '136 patent is entitled, "Application Management System with Configurable Software Applications."  The '136 patent lawfully issued on September 7, 2010 and stems from U.S. Patent Application No. 11/616,650, which was filed on December 27, 2006.  A copy of the '136 patent is attached hereto as Ex. 2.

COMPLAINT

10. The '816 patent is entitled, "Method and Apparatus to Dynamically Configure a Vehicle Audio System." The '816 patent lawfully issued on February 10, 2015 and stems from U.S. Patent Application No. 13/196,654, which was filed on August 2, 2011. A copy of the '816 patent is attached hereto as Ex. 3.

11. The '015 patent is entitled, "Vehicle Audio Application Management System Using Logic Circuitry." The '015 patent lawfully issued on July 4, 2017 and stems from U.S. Patent Application No. 13/253,284, which was filed on October 5, 2011. A copy of the '015 patent is attached hereto as Ex. 4.

12. The '292 patent is entitled, "System and Method for Restricting Access to Vehicle Software Systems." The '292 patent lawfully issued on November 12, 2013 and stems from U.S. Patent Application No. 12/775,991, which was filed on May 7, 2010. A copy of the '292 patent is attached hereto as Ex. 5.

13. The '049 patent is entitled, "Method for Multi-Tasking Multiple Java Virtual Machines in a Secure Environment." The '049 patent lawfully issued on February 13, 2007 and stems from U.S. Patent Application No. 10/132,886, which was filed on April 24, 2002. A copy of the '049 patent is attached hereto as Ex. 6.

14. MicroPairing is the owner of the patents-in-suit with all substantial rights, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

15. The claims of the patents-in-suit are directed to patent eligible subject matter under 35 U.S.C. § 101. They are not directed to an abstract idea, and the technologies covered by the claims comprise vehicle systems and/or consist of ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

16. The specification of the '073 patent discloses shortcomings in the prior art and then explains, in detail, the technical way the claimed inventions resolve or overcome those shortcomings. For example, the '073 patent explains that car audio systems had a number of issues, including that: (1) "[a]ny other portable audio sources

brought into the car cannot use the car speakers or amplifier system;" (2) "in-dash audio devices or portable audio devices brought into the car [] can disrupt the attention of the car driver;" and (3) "[o]ther types of audio devices, such as cellular telephones, are difficult to operate and hear while driving in a car." Ex. 1 at 1:5-28. To solve these problems, the '073 patent discloses the following invention:

> A vehicle audio system includes a wireless audio sensor configured to wirelessly detect different portable audio sources brought into the vehicle. Audio output devices are located in the vehicle for outputting audio signals from the different audio sources. A processor selectively connects the different audio sources to the different audio output devices.

*Id.* at 2:31-36.

17. The '073 patent specification goes on to describe an "audio manager 14 [that] detects and communicates with the different wireless audio sources using any one of a variety of wireless communication protocols, such as Bluetooth or IEEE 802.11." *Id.* at 2:39-42. This audio manager also "detect[s] different portable audio output devices and any audio output devices contained in the audio output device." *Id.* at 2:53-60. The audio manager further "displays the different audio output devices on GUI 30." *Id.* at 2:61-62. "The audio manager 14 in block 42 monitors the area around and inside the vehicle 12 for any audio sources or audio output devices that may be transmitting a wireless signal. Any detected audio sources or audio output devices are displayed on the GUI 30 in block 44. The data manager in block 46 then determines what applications are associated with the different audio sources." *Id.* at 3:25-36. To decide which applications to output to audio,

> The data manager 14 in block 50 identifies any priorities and security values associated with the identified audio applications. In block 52, the data manager 14 identifies requests to output different ones of the audio sources to different ones of the audio output devices. The selected audio application may have a higher priority than the audio application that is currently connected to the selected audio output device. If the priority of the requesting audio application is the same or higher than the currently connected audio application, then the audio manager 14 in block 56 replaces the audio application currently coupled to the audio output device with the selected audio application. If the requesting audio application has a lower priority than the audio application currently coupled to the audio output device, then the audio manager in block 54 will not connect the new audio application.

COMPLAINT

*Id.* at 3:25-36.

18.     Solutions to the problems outlined in the '073 patent are, for example, embodied in claim 10:

> A vehicle audio system, comprising:
>
> a wireless audio sensor configured to wirelessly detect different audio sources brought into or next to a vehicle;
>
> wireless audio output devices for outputting audio data having assigned priority values; and
>
> a processor for selectively connecting the different audio sources to the audio output devices according to the assigned priority values for the audio data.

*Id.* at claim 10.  The wireless audio sources are connected selectively to differing audio output devices according to the ***assigned priority values*** for the audio data.  A wireless audio sensor detects the different sources brought into the vehicle, and a processor connects these sources to the output devices.  This claim solves the issues of: (1) other portable audio sources not being able to use the car speakers; (2) audio devices potentially distracting the driver; and (3) other types of audio devices being difficult to hear and operate while driving a car.

19.     The specification of the '136 patent also discloses shortcomings in the prior art and then explains, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.  The specification of the '136 patent discusses Java virtual machines (JVMs), which make "it possible for Java application programs to be built that can run on any platform without having to be rewritten or recompiled by the programmer for each separate platform."  Ex. 2 at 1:27-34.  The specification also describes the Jini system, which "extends the Java application environment from a single virtual machine to a network of machines. . . . The Jini infrastructure provides mechanisms for devices, services, and users to join and detach from a network.  Jini systems are more dynamic than is currently possible in networked groups where configuring a network is a centralized function done by hand."  *Id.* at 1:34-47.

20.    "However, the Java/Jini approach is not without its disadvantages.  Both Java and Jini are free, open source applications.  The Java application environment is not designed for controlling messaging between different machines." *Id.* at 1:48-58. "For example, the Java application is not concerned about the protocols between different hardware platforms.  Jini has some built-in security that allows code to be downloaded and run from different machines in confidence.  However, this limited security is insufficient for environments where it is necessary to further restrict code sharing or operation sharing among selected devices in a secure embedded system." *Id.*

21.    To solve these problems, the '136 patent proposes a "Secure Real-time Executive (SRE) 14 [which] provides an extension to the JVM 16 and allows Java to run on different processors for real-time applications.  The SRE 20 manages messaging, security, critical data, file I/O multiprocessor task control and watchdog tasks in the Java environment as described below." *Id.* at 2:35-43.  "For example, the SRE 14 may prevent noncritical vehicle applications, such as audio control, from being loaded onto processor 16." *Id.* at 2:66-3:6.

22.    The advantages of the invention of the '136 patent are taught as follows:

The SRE 14 allows any variety of real-time, mission critical, nonreal-time and nonmission critical Java applications to be loaded onto the multiprocessor system 15. The SRE 14 then automatically manages the different types of applications and messages to ensure that the critical vehicle applications are not corrupted and processed with the necessary priority. The SRE 14 is secure software that cannot be manipulated by other Java applications.

The SRE 14 provides priority preemption on a message scale across the entire system 15 and priority preemption on a task scale across the entire system 15. So the SRE 14 controls how the JVMs 10 talk to each other and controls how the JVMs 10 are started or initiated to perform tasks. The SRE 14 allows programmers to write applications using Java in a safe and secure real time environment. Thus, viruses can be prevented by SRE 14 from infiltrating the system 15.

*Id.* at 3:15-30.

COMPLAINT

23.     An important aspect of the invention of the '136 patent is the message manager:

> The message manager 50 determines the priority of sent and received messages. If the data transmitted and received by the sensor fusion thread 76 is higher priority than other data transmitted and received on the processor 84, then the sensor fusion data will be given priority over the other data. The task manager 58 controls the priority that the sensor fusion thread 76 is giving by processor 84. If the sensor fusion thread 76 has higher priority than, for example, an audio application that is also being run by processor 84, then the sensor fusion thread 76 will be performed before the audio application.

*Id.* at 4:60-5:3.

24.     Solutions to the problems outlined by the '136 patent are embodied in, for example, claim 31:

> An apparatus, comprising:
>
> a multiprocessor system configured to:
>
> identify a new device that is not currently coupled to the multiprocessor system;
>
> detect a communication protocol used by the new device and connect the new device to the multiprocessor system when signaling from the new device conforms to a communication protocol used in the multiprocessor system;
>
> configure the new device into the multiprocessor system when a data protocol operated by the new device conforms with a data protocol used in the multiprocessor system;
>
> display an image representing the new device on a graphical interface;
>
> identify data codes in the signaling from the new device identifying an application running on the new device, a data type used on the new device, and a security level associated with data stored in the new device;
>
> use the identified security level to prevent unauthorized data from being loaded into the multiprocessor system;
>
> identify a stored application in memory in the multiprocessor system that uses the same data type used on the new device and download the stored application from memory into a processor in the multiprocessor system;
>
> display an image on the graphical user interface representing the stored application loaded into the processor in the multiprocessor system; and

COMPLAINT

use the stored application to direct data exchanged with the portable device to a selectable output or a selectable input identified on the graphical interface.

*Id.* at claim 31.

25.    The specification of the '816 patent also discloses shortcomings in the prior art and then explains, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.  The specification of the '816 patent discusses how "[c]ars include many different electro-mechanical and electronic applications. . . . [But] [g]enerally the processors that control these different car systems do not talk to each other." Ex. 3 at 1:17-32. "For example, separate processors and separate user interfaces are required for the car temperature control system and for the car audio system.  Many of these different car processors may be underutilized since they are only used intermittently."  *Id.*  And "[e]ven when multiple processors in the car do talk to each other, they are usually so tightly coupled together that it is impossible to change any one of these processors without disrupting all of the systems that are linked together."  *Id.* at 1:33-41.  Furthermore, "[i]ntegration of new systems into a car is also limited.  Car systems are designed and selected well before the car ever built. . . . Because after market devices cannot be integrated into car control and interface systems, it is often difficult for the driver to try and operate these after market devices."  *Id.* at 1:42-49.

26.    To solve these problems, the '816 patent teaches:

A multiprocessor system used in a car, home, or office environment includes multiple processors that run different real-time applications. A dynamic configuration system runs on the multiple processors and includes a device manager, configuration manager, and data manager. The device manager automatically detects and adds new devices to the multiprocessor system, and the configuration manager automatically reconfigures which processors run the real-time applications. The data manager identifies the type of data generated by the new devices and identifies which devices in the multiprocessor system are able to process the data.

*Id.* at 1:65-2:8.

27.    The specification of the '816 patent describes an embodiment of the invention as follows:

FIGS. 5 and 6 show how a new device is added to the multiprocessor system 8. Each of the existing processors A, B, C, and D after power-up are configured to identify a set or subset of the processors in the multiprocessor system 8. A new device 72 is brought into the multiprocessor system 8 either via a hardwired link or a wireless link. For example, the device E may send out signals over any one or more of a 802.11 wireless link 67, Blue tooth wireless link 71 or send out signals over a hardwired Ethernet link 69. Depending on what communication protocol is used to send signals, one or more of the processors A, B, C or D using a similar communication protocol detect the processor E in block 74 (FIG. 6). All of the processors may be connected to the same fiber optic or packet switched network that is then used to communicate the information from processor E to the other processors.

One of the device managers 46 in the multiprocessor system 8 checks the signals from processor E checks to determine if the signals are encrypted in a recognizable protocol in block 76. The device manager in the processor receiving the signals from processor E then checks for any data codes from the new device signals in block 76. The data codes identify data types used in one or more applications by processor E. A device ID for processor E is then determined from the output signals in block 80.

If all these data parameters are verified, the device managers 46 in one or more of the processors A, B, C and D add the new processor E to their processor arrays in block 82. For example, processor A adds processor E to the processor array in memory 65. After being incorporated into the multiprocessor system 8, the processor E or the applications running on the processor E may be displayed on a graphical user interface in block 84.

*Id.* at 4:51-5:7

28.    Solutions to the problems outlined by the '816 patent are embodied, for example, in claim 1:

A method of operating a vehicle audio system having a wired audio source, a display, multiple speakers and a logic circuit configured to:

sense the availability of a wireless audio device that is located within or proximate to the vehicle;

identify a wireless audio device record from among a plurality of different wireless audio device records previously identified and stored in memory, wherein the wireless device record includes previously identified data codes from the wireless audio device and from a first software application running on the wireless audio device;

responsive to identifying the data codes and first software application running on the wireless audio device from the stored record, download a copy of a second software application selected from the memory and process data from the wireless audio device with the second software application;

provide a user with an option to direct sound from the wireless audio device through at least a first one of the speakers of the vehicle audio system or back to a speaker in the wireless audio device.

*Id.* at claim 1.

29.    The specification of the '015 patent also discloses shortcomings in the prior art and then explains, in detail, the technical way the claimed inventions resolve or overcome those shortcomings. The '015 patent identifies the same problems as the '816 patent specification. *See* Ex. 4 at 2:56-3:31.

30.    To solve these problems, the '015 patent teaches:

A multiprocessor system used in a car, home, or office environment includes multiple processors that run different real-time applications. A dynamic configuration system runs on the multiple processors and includes a device manager, configuration manager, and data manager. The device manager automatically detects and adds new devices to the multiprocessor system, and the configuration manager automatically reconfigures which processors run the real-time applications. The data manager identifies the type of data generated by the new devices and identifies which devices in the multiprocessor system are able to process the data.

*Id.* at 4:14-26.

31.    The specification of the '015 patent describes an embodiment of the invention as follows:

FIGS. 5 and 6 show how a new device is added to the multiprocessor system 6008. Each of the existing processors A, B, C, and D after power-up are configured to identify a set or subset of the processors in the multiprocessor system 6008. A new device 6072 is brought into the multiprocessor system 6008 either via a hardwired link or a wireless link. For example, the device E may send out signals over any one or more of a 802.11 wireless link 6067, Blue tooth wireless link 71 or send out signals over a hardwired Ethernet link 6069. Depending on what communication protocol is used to send signals, one or more of the processors A, B, C or D using a similar communication protocol detect the processor E in block 6074 (FIG. 6). All of the processors may be connected to the same fiber optic or packet switched network that is then used to communicate the information from processor E to the other processors.

One of the device managers 6046 in the multiprocessor system 6008 checks the signals from processor E checks to determine if the signals are encrypted in a recognizable protocol in block 6076. The device manager in the processor receiving the signals from processor E then checks for any data codes from the new device signals in block 6076. The data codes identify data types used in one or more applications by processor E. A device ID for processor E is then determined from the output signals in block 6080.

COMPLAINT

If all these data parameters are verified, the device managers 6046 in one or more of the processors A, B, C and D add the new processor E to their processor arrays in block 6082. For example, processor A adds processor E to the processor array in memory 6065. After being incorporated into the multiprocessor system 6008, the processor E or the applications running on the processor E may be displayed on a graphical user interface in block 6084.

*Id.* at 7:54-8:19.

32.     Solutions to the problems outlined by the '015 patent are embodied, for example, in claim 6:

A method of operating an audio system in a vehicle comprising:

networking multiple processors together into a multiprocessor system, the multi-processor system which is configured to:

operate a wireless transceiver;

monitor for wireless signals from a new device not currently coupled to the multiprocessor network and moved into the vehicle, wherein the new device runs a first software application that processes a first type of data;

sense the availability of a wireless audio device that is located within or proximate to the vehicle;

wirelessly connect the new device to the multiprocessor system;

identify a wireless audio device record from among a plurality of different wireless audio device records previously identified and stored in memory, wherein the wireless device record includes previously identified data codes from the wireless audio device and a first software application running on the wireless audio device;
responsive to identifying the data codes and first software application running on the wireless audio device from the stored record, select from memory at least one of a copy of a second software application and software code elements to process data from the wireless audio device; and

provide a vehicle occupant with an option to play sound from the wireless audio device through at least one of a first speaker of the vehicle audio system and a speaker in the wireless audio device.

*Id.* at claim 6.

33.     The specification of the '292 patent also discloses shortcomings in the prior art and then explains, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.  The specification of the '292 patent explains, for instance, that "[c]ars include many different electro-mechanical and electronic

COMPLAINT

systems … the processors that control these different car systems do not talk to each other." Ex. 5 at 1:13-20. "This means that each one of these car systems operate independently and do not talk to the other car systems. For example, separate processors and separate user interfaces are required for the car temperature control system and for the car audio system. Many of these different car processors may be underutilized since they are only used intermittently." *Id*. at 1:22-28 "Even when multiple processors in the car do talk to each other, they are usually so tightly coupled together that it is impossible to change any one of these processors without disrupting all of the systems that are linked together." *Id.* at 1:29-32. And "[i]ntegration of new systems into a car is also limited." *Id.* at 1:38. Indeed, "[b]ecause after market devices can not be integrated into car control and interface systems, it is often difficult for the driver to try and operate these after market devices…." *Id.* at 1:46-55.

34.    To solve these problems, the '292 patent describes the invention as follows:

> A multiprocessor system used in a car, home, or office environment includes multiple processors that run different real-time applications. A dynamic configuration system runs on the multiple processors and includes a device manager, configuration manager, and data manager. The device manager automatically detects and adds new devices to the multiprocessor system, and the configuration manager automatically reconfigures which processors run the real-time applications. The data manager identifies the type of data generated by the new devices and identifies which devices in the multiprocessor system are able to process the data.

*Id.* at 1:61-2:4. More specifically, "The processors [] all include software that run a Dynamic Configuration (DC) system 10 that enables new processors or devices to be automatically added and removed from the car multiprocessor system 8. The DC system 10 also automatically reconfigures the applications running on different processors according to application failures and other system processing requirements." *Id.* at 2:36-42.

35.    Solutions to the problems outlined by the '292 patent are embodied, for example, in claim 1:

COMPLAINT

A system of multiple processors used in a vehicle, wherein one of the processors is configured to allow access to vehicle systems, comprising:

a processor, wherein the processor is configured to operate in a distributed processing system, the processor further configured to:

identify a new device that is not currently coupled to a vehicle processor;

connect the new device to the vehicle processor when signaling from the new device conforms to a communication protocol used in the vehicle processor;
configure the new device to operate with the vehicle processor;

identify data codes in the signaling from the new device identifying at least one of an application running on the new device, a data type used on the new device, and a security attribute associated with at least one of device type, data stored in the new device and the application running on the new device;

use the identified security attribute to prevent at least one of an unauthorized application and unauthorized data from being transferred and processed by the processor;

identify a stored application in memory accessible by the processor, wherein the application processes the same data type used by the new device;
responsive to identifying the stored application, download the stored application from memory into the processor;

use the application to process data received from the new device; and select an appropriate human machine interface to output the data.

*Id.* at claim 1.

36.    The specification of the '049 patent also discloses shortcomings in the prior art and then explains, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.  For example, the specification of the '049 patent discusses that:

A java application stack includes a Java layer 5 for running any one of multiple different applications. In one example, the applications are related to different vehicle operations such as Infrared (IR) and radar sensor control and monitoring, vehicle brake control, vehicle audio and video control, environmental control, driver assistance control, etc. A Java Virtual Machine (NM) layer 16 provides the hardware independent platform for running the Java applications 5. A Jini layer 12 provides some limited security for the Java applications that run on different machines. However, the Jini layer 12 does not provide the necessary reconfiguration

COMPLAINT

and security management necessary for a distributed real-time multiprocessor system.

Ex. 6 at 2:22-35. To resolve this issue, the '049 patent proposes:

> A Secure Real-time Executive (SRE) 14 provides an extension to the JVM 16 and allows Java to run on different processors for real-time applications. The SRE 20 manages messaging, security, critical data, file I/O multiprocessor task control and watchdog tasks in the Java environment as described below. The JVM 16, Jini 12 and SRE 14 can all be implemented in the same NM 10.

*Id.* at 2:36-42.

37.     The '049 patent describes how this invention would apply to motor vehicles:

> The SRE 14 runs below the JVMs 10 in each processor and control tasks, messaging, security, etc. For example, the Java application 26 controls vehicle braking according to the sensor data collected by the sensor fusion Java application 32. The SRE 14 in one example prevents unauthorized data from being loaded into the processor 16 that runs brake control application 26. The SRE 14 also prevents other Java applications that are allowed to be loaded into processor 16 from disrupting critical braking operations, or taking priority over the braking operations, performed by Java application 26.
>
> For example, the SRE 14 may prevent noncritical vehicle applications, such as audio control, from being loaded onto processor 16. In another example, noncritical operations, such as security control application 28, are allowed to be loaded onto processor 16. However, the SRE 14 assigns the security messages low priority values that will only be processed when there are no braking tasks in application 26 that require processing by processor 16.

*Id.* at 2:57-3:8.

38.     Solutions to the problems outlined by the '049 patent are embodied, for example, in claim 29:

> A method for configuring real-time vehicle applications in a distributed multi-processor system operating in a vehicle, comprising:

COMPLAINT

identifying vehicle applications running on different processors in the multiprocessor system;

operating a task manager that obtains different data and state information associated with the different vehicle applications;

operating a configuration manager that notifies the task manager upon detecting a failure running one of the identified vehicle applications in the multiprocessor system;

using the task manager for automatically identifying another processor in the multiprocessor system for running the identified vehicle application and redirecting the vehicle application associated with the detected failure to the other identified processor in the vehicle;

using the configuration manager to redirect the data and state information to the other identified processor in the vehicle after detecting the failure; and

initiating the identified application in the identified other processor.

*Id.*, claim 29.

39.   In essence, the patents-in-suit relate to novel and non-obvious inventions in the field of in-vehicle device connectivity, specifically infotainment systems and the AUTOSAR platform in cars and trucks.

## COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 6,778,073

40.   MicroPairing repeats and realleges each allegation above as if fully set forth herein.

41.   This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq.*

42.   MicroPairing is the owner of the '073 patent with all substantial rights to the '073 patent including the exclusive right to enforce, sue, and recover damages for past and future infringements.

43.    The '073 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

44.    Attached hereto as Ex. 7, and incorporated herein by reference, is a claim chart detailing how Hyundai infringes the '073 patent.

DIRECT INFRINGEMENT (35 U.S.C. § 271(a))

45.    Hyundai has directly infringed and continues to directly infringe one or more claims of the '073 patent in this District and elsewhere in California and the United States.

46.    To this end, Hyundai has infringed and continues to infringe, either by itself or via an agent, at least claim 10 of the '073 patent by, among other things, making, offering to sell, selling, testing and/or using Hyundai and Genesis vehicles with infotainment systems.

DAMAGES

47.    Hyundai is liable for its infringements of the '073 patent pursuant to 35 U.S.C. § 271.

48.    MicroPairing has been damaged as a result of Hyundai's infringing conduct described in this Count.  Hyundai is, thus, liable to MicroPairing in an amount that adequately compensates it for Hyundai's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

COUNT II

INFRINGEMENT OF U.S. PATENT NO. 7,793,136

49.    MicroPairing repeats and realleges each allegation above as if fully set forth herein.

50.    This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq.*

COMPLAINT

51.    MicroPairing is the owner of the '136 patent with all substantial rights to the '136 patent including the exclusive right to enforce, sue, and recover damages for past and future infringements.

52.    The '136 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

53.    Attached hereto as Ex. 8, and incorporated herein by reference, is a claim chart detailing how Hyundai infringes the '136 patent.

### DIRECT INFRINGEMENT (35 U.S.C. § 271(a))

54.    Hyundai has directly infringed and continues to directly infringe one or more claims of the '136 patent in this District and elsewhere in California and the United States.

55.    To this end, Hyundai has infringed and continues to infringe, either by itself or via an agent, at least claims 1 and 31 of the '136 patent by, among other things, making, offering to sell, selling, testing and/or using Hyundai and Genesis vehicles with infotainment systems.

### INDIRECT INFRINGEMENT (INDUCEMENT – 35 U.S.C. § 271(b))

56.    Hyundai has also indirectly infringed and continues to indirectly infringe one or more claims of the '136 patent by inducing direct infringement by its Hyundai and Genesis vehicle customers and end users.

57.    Hyundai has knowledge of the '136 patent, its infringements, and the infringements of its customers and end users based, at least, on its receipt of this Complaint and independent notice served it via Federal Express (complete with claim charts).

58.    Despite having knowledge (or being willfully blind to the fact) that use of the Hyundai and Genesis vehicles with infotainment systems infringe the '136 patent, Hyundai has specifically intended, and continues to specifically intend, for persons who acquire and use such vehicles, including Hyundai's customers and end users, to use the vehicles in a way that results in infringement of the '136 patent, including at

1    least claim 18.  Indeed, Hyundai knew or should have known that its actions have

2    induced, and continue to induce, such infringements.

3         59.    Hyundai instructs and encourages its customers and end users to use their

4    Hyundai or Genesis vehicles in a manner that infringes the '136 patent.  For example,

5    Hyundai provides users with a reference guide, such as the Genesis G90 Quick

6    Reference Guide

7    (https://owners.genesis.com/genesis/us/mygenesis/manuals/glovebox-

8    manual/2020/g90/2020-G90-Quick-Reference-Guide.pdf), which guides users with

9    instructions on how to use the infotainment system in a way that results in

10   infringement of the '136 patent.

**DAMAGES**

12        60.    Hyundai is liable for its infringements of the '136 patent pursuant to 35

13   U.S.C. § 271.

14        61.    MicroPairing has been damaged as a result of Hyundai's infringing

15   conduct described in this Count.  Hyundai is, thus, liable to MicroPairing in an

16   amount that adequately compensates it for Hyundai's infringements, which, by law,

17   cannot be less than a reasonable royalty, together with interest and costs as fixed by

18   this Court under 35 U.S.C. § 284.

**COUNT III**

**INFRINGEMENT OF U.S. PATENT NO. 8,953,816**

21        62.    MicroPairing repeats and realleges each allegation above as if fully set

22   forth herein.

23        63.    This cause of action arises under the patent laws of the United States, and

24   in particular, 35 U.S.C. §§ 271, *et seq.*

25        64.    MicroPairing is the owner of the '816 patent with all substantial rights to

26   the '816 patent including the exclusive right to enforce, sue, and recover damages for

27   past and future infringements.

28

65.    The '816 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

66.    Attached hereto as Ex. 9, and incorporated herein by reference, is a claim chart detailing how Hyundai infringes the '816 patent.

**DIRECT INFRINGEMENT (35 U.S.C. § 271(a))**

67.    Hyundai has directly infringed and continues to directly infringe one or more claims of the '816 patent in this District and elsewhere in California and the United States.

68.    To this end, Hyundai has infringed and continues to infringe, either by itself or via an agent, at least claims 17 – 23 of the '816 patent by, among other things, making, offering to sell, selling, testing and/or using Hyundai and Genesis vehicles with infotainment systems.

**INDIRECT INFRINGEMENT (INDUCEMENT – 35 U.S.C. § 271(b))**

69.    Hyundai has also indirectly infringed and continues to indirectly infringe one or more claims of the '816 patent by inducing direct infringement by its Hyundai and Genesis customers and end users.

70.    Hyundai has knowledge of the '816 patent, its infringements, and the infringements of its customers and end users based, at least, on its receipt of this Complaint and independent notice served it via Federal Express (complete with claim charts).

71.    Despite having knowledge (or being willfully blind to the fact) that use of Hyundai and Genesis vehicles with infotainment systems infringes the '816 patent, Hyundai has specifically intended, and continues to specifically intend, for persons who acquire and/or use Hyundai or Genesis vehicles, including Hyundai's customers and end users, to use their vehicles in a way that results in infringement of the '816 patent, including at least claims 1 – 4, 6, and 10 – 16.  Indeed, Hyundai knew or should have known that its actions have induced, and continue to induce, such infringements.

COMPLAINT

72.     Hyundai instructs and encourages customers and end users to use Hyundai and Genesis vehicles in a manner that infringes the '816 patent.  For example, Hyundai provides users with a reference guide, such as the Genesis G90 Quick Reference Guide (https://owners.genesis.com/genesis/us/mygenesis/manuals/glovebox-manual/2020/g90/2020-G90-Quick-Reference-Guide.pdf), which guides users with instructions on how to use the infotainment system in a way that results in infringement of the '816 patent.

### DAMAGES

73.     Hyundai is liable for its infringements of the '816 patent pursuant to 35 U.S.C. § 271.

74.     MicroPairing has been damaged as a result of Hyundai' infringing conduct described in this Count.  Hyundai is, thus, liable to MicroPairing in an amount that adequately compensates it for Hyundai' infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT IV

### INFRINGEMENT OF U.S. PATENT NO. 9,697,015

75.     MicroPairing repeats and realleges each allegation above as if fully set forth herein.

76.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq.*

77.     MicroPairing is the owner of the '015 patent with all substantial rights to the '015 patent including the exclusive right to enforce, sue, and recover damages for past and future infringements.

78.     The '015 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

COMPLAINT

79.     Attached hereto as Ex. 10, and incorporated herein by reference, is a claim chart detailing how Hyundai infringes the '015 patent.

**DIRECT INFRINGEMENT (35 U.S.C. § 271(a))**

80.     Hyundai has directly infringed and continues to directly infringe one or more claims of the '015 patent in this District and elsewhere in California and the United States.

81.     To this end, Hyundai has infringed and continues to infringe, either by itself or via an agent, at least claims 17 – 18 of the '015 patent by, among other things, making, offering to sell, selling, testing and/or using Hyundai and Genesis vehicles with infotainment systems.

**INDIRECT INFRINGEMENT (INDUCEMENT – 35 U.S.C. § 271(b))**

82.     Hyundai has also indirectly infringed and continues to indirectly infringe one or more claims of the '015 patent by inducing direct infringement by its Hyundai and Genesis vehicle customers and end users.

83.     Hyundai has knowledge of the '015 patent, its infringements, and the infringements of its customers and end users based, at least, on its receipt of this Complaint and independent notice served it via Federal Express (complete with claim charts).

84.     Despite having knowledge (or being willfully blind to the fact) that use of the Hyundai and Genesis vehicles with infotainment systems infringe the '015 patent, Hyundai has specifically intended, and continues to specifically intend, for persons who acquire and use such vehicles, including Hyundai's customers and end users, to use the vehicles in a way that results in infringement of the '015 patent, including at least claims 1 – 11, 13 – 14, and 16.  Indeed, Hyundai knew or should have known that its actions have induced, and continue to induce, such infringements.

85.     Hyundai instructs and encourages its customers and end users to use their Hyundai or Genesis vehicles in a manner that infringes the '015 patent. For example, Hyundai provides users with a reference guide, such as the Genesis G90 Quick

COMPLAINT

Reference Guide

(https://owners.genesis.com/genesis/us/mygenesis/manuals/glovebox-manual/2020/g90/2020-G90-Quick-Reference-Guide.pdf), which guides users with instructions on how to use the infotainment system in a way that results in infringement of the '015 patent.

**DAMAGES**

86.    Hyundai is liable for its infringements of the '015 patent pursuant to 35 U.S.C. § 271.

87.    MicroPairing has been damaged as a result of Hyundai's infringing conduct described in this Count.  Hyundai is, thus, liable to MicroPairing in an amount that adequately compensates it for Hyundai's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT V**

**INFRINGEMENT OF U.S. PATENT NO. 8,583,292**

88.    MicroPairing repeats and realleges each allegation above as if fully set forth herein.

89.    This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

90.    MicroPairing is the owner of the '292 patent with all substantial rights to the '292 patent including the exclusive right to enforce, sue, and recover damages for past and future infringements.

91.    The '292 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

92.    Attached hereto as Ex. 11, and incorporated herein by reference, is a claim chart detailing how Hyundai infringes the '292 patent.

**DIRECT INFRINGEMENT (35 U.S.C. § 271(a))**

24

COMPLAINT

93.    Hyundai has directly infringed and continues to directly infringe one or more claims of the '292 patent in this District and elsewhere in California and the United States.

94.    To this end, Hyundai has infringed and continues to infringe, either by itself or via an agent, at least claim 1 – 2, 4 – 13, and 15 – 17 of the '292 patent by, among other things, making, offering to sell, selling, testing and/or using Hyundai and Genesis vehicles with infotainment systems.

### DAMAGES

95.    Hyundai is liable for its infringements of the '292 patent pursuant to 35 U.S.C. § 271.

96.    MicroPairing has been damaged as a result of Hyundai's infringing conduct described in this Count.  Hyundai is, thus, liable to MicroPairing in an amount that adequately compensates it for Hyundai's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT VI

### INFRINGEMENT OF U.S. PATENT NO. 7,178,049

97.    MicroPairing repeats and realleges each allegation above as if fully set forth herein.

98.    This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq.*

99.    MicroPairing is the owner of the '049 patent with all substantial rights to the '049 patent including the exclusive right to enforce, sue, and recover damages for past and future infringements.

100.    The '049 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

101.    Attached hereto as Ex. 12, and incorporated herein by reference, is a claim chart detailing how Hyundai infringes the '049 patent.

**DIRECT INFRINGEMENT (35 U.S.C. § 271(a))**

102.   Hyundai has directly infringed and continues to directly infringe one or more claims of the '049 patent in this District and elsewhere in California and the United States.

103.   To this end, Hyundai has infringed and continues to infringe, either by itself or via an agent, at least claims 29 – 31 of the '049 patent by, among other things, testing and/or using Hyundai and Genesis vehicles with infotainment systems and that operate on the AUTOSAR platform.

**INDIRECT INFRINGEMENT (INDUCEMENT – 35 U.S.C. § 271(b))**

104.   Hyundai has also indirectly infringed and continues to indirectly infringe one or more claims of the '049 patent by inducing direct infringement by its Hyundai and Genesis vehicle customers and end users.

105.   Hyundai has knowledge of the '049 patent, its infringements, and the infringements of its customers and end users based, at least, on its receipt of this Complaint and independent notice served it via Federal Express (complete with claim charts).

106.   Despite having knowledge (or being willfully blind to the fact) that use of the Hyundai and Genesis vehicles with infotainment systems and that operate on the AUTOSAR platform infringe the '049 patent, Hyundai has specifically intended, and continues to specifically intend, for persons who acquire and use such vehicles, including Hyundai's customers and end users, to use the vehicles in a way that results in infringement of the '049 patent, including at least claims 29 – 31.  Indeed, Hyundai knew or should have known that its actions have induced, and continue to induce, such infringements.

107.   Hyundai instructs and encourages its customers and end users to use their Hyundai or Genesis vehicles in a manner that infringes the '049 patent.  For example, Hyundai provides users with a reference guide, such as the Genesis G90 Quick Reference Guide

COMPLAINT

1  ([https://owners.genesis.com/genesis/us/mygenesis/manuals/glovebox-](https://owners.genesis.com/genesis/us/mygenesis/manuals/glovebox-)

2  [manual/2020/g90/2020-G90-Quick-Reference-Guide.pdf](https://owners.genesis.com/genesis/us/mygenesis/manuals/glovebox-manual/2020/g90/2020-G90-Quick-Reference-Guide.pdf)), and owner's manual, such

3  as the 2020 Genesis G90 Owner's Manual

4  ([https://owners.genesis.com/genesis/us/mygenesis/manuals/glovebox-](https://owners.genesis.com/genesis/us/mygenesis/manuals/glovebox-)

5  [manual/2020/g90/2020-G90-Owner's-Manual.pdf](https://owners.genesis.com/genesis/us/mygenesis/manuals/glovebox-manual/2020/g90/2020-G90-Owner's-Manual.pdf)), which guide users with

6  instructions on how to use the infotainment system and vehicle safety features that

7  implicate the AUTOSAR platform in a way that results in infringement of the '049

8  patent.

9  ## RELIEF SOUGHT

10      MicroPairing respectfully requests the following relief:

11  A.  Judgment and Order that Hyundai has directly infringed one or more claims of

12      each of the patents-in-suit;

13  B.  Judgment and Order that Hyundai has induced infringement of one or more

14      claims of the '816 patent, '136 patent, and '015 patent;

15  C.  Judgment and Order that Hyundai must pay MicroPairing past and future

16      damages under 35 U.S.C. § 284, including supplemental damages arising from

17      any continuing, post-verdict infringement for the time between trial and entry of

18      the final judgment, together with an accounting, as needed, as provided under

19      35 U.S.C. § 284;

20  D.  Judgment and Order that Hyundai must pay MicroPairing reasonable ongoing

21      royalties on a go-forward basis after Final Judgment;

22  E.  Judgment and Order that Hyundai must pay MicroPairing pre-judgment and

23      post-judgment interest on the damages award;

24  F.  Judgment and Order that Hyundai must pay MicroPairing's costs;

25  G.  Judgment and Order that the Court find this case exceptional under the

26      provisions of 35 U.S.C. § 285; and

27  H.  Such other and further relief as the Court may deem just and proper.

28

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), MicroPairing demands a trial by jury on all issues triable by jury.

DATED: May 12, 2021                    Respectfully submitted,

*/s/ Ryan E. Hatch*
RYAN E. HATCH (SBN 235577)
ryan@hatchlaw.com
Hatch Law, PC
13323 Washington Blvd., Suite 100
Los Angeles, CA 90066
Tel: 310-279-5079
Fax: 310-693-5328

Edward R. Nelson III (Texas SBN 00797142)
ed@nbafirm.com
*pro hac vice forthcoming*
Ryan P. Griffin (Texas SBN 24053687)
ryan@nbafirm.com
*pro hac vice forthcoming*
Brian P. Herrmann (Texas SBN 24083174)
brian@nbafirm.com
*pro hac vice forthcoming*
NELSON BUMGARDNER ALBRITTON PC
3131 West Seventh Street
Suite 300
Fort Worth, TX 76107
Telephone: 817.377.9111

Timothy E. Grochocinski (Illinois SBN 6295055)
tim@nbafirm.com
*pro hac vice forthcoming*
NELSON BUMGARDNER ALBRITTON PC
15020 S. Ravinia Avenue, Suite 29
Orland Park, Illinois 60462
Telephone: 708.675.1974

*Attorneys for Plaintiff*
*MICROPAIRING TECHNOLOGIES LLC*